COMMONWEALTH of Pennsylvania,
Appellee,

v.

Margaret DELLISANTI, Appellant

COMMONWEALTH of Pennsylvania,
Appellant.

v.

Margaret Dellisanti, Appellee

Superior Court of Pennsylvania.

Argued Nov. 7, 2002.

Filed Aug. 21, 2003.

Michael J. Reed, Paoli, for Dellisanti.

James W. Staerk, Assistant District Attorney, Norristown, for Com.

Before: DEL SOLE, P.J., MCEWEN, P.J.E., HUDOCK, JOYCE, STEVENS, TODD, KLEIN, BENDER, and GRACI, JJ.

McEWEN, P.J.E.:

¶ 1 Appellant, Margaret Dellisanti[1] has taken this direct appeal from the judgment of sentence imposed after a jury found her guilty of two counts of corrupt organizations, four counts of delivery of drug paraphernalia, one count of possession with intent to deliver drug paraphernalia, and five counts of criminal conspiracy. We affirm in part, and vacate and remand for resentencing.

¶ 2 Appellant is the owner of a clothing store in Montgomery County, in which designer clothes and jewelry are displayed for sale to the public. On September 14, 1999, Detective Erik Echevarria of the Montgomery County Detectives Narcotics Enforcement Team (NET), working undercover, visited the appellant's store.

¶ 3 While in the store, Detective Echevarria requested inositol,[2] which was not an item of apparel and not an item displayed for sale. Following this request, Detective Echevarria was referred to "Tony" the store manager[3] who removed a one half-ounce (1/2 oz.) bottle of inositol from underneath a podium in the store and handed it to Detective Echevarria. When the detective then requested small plastic baggies, Tony showed him a cardboard chart on which baggies of different sizes and colors were attached. Tony instructed Detective Echevarria to choose the size and color of the baggies he desired to purchase.[4] After Detective Echevarria made his selection, Tony retrieved the baggies from beneath the counter and sold both the inositol and the baggies to Detective Echevarria. The inositol, the cardboard chart, and the baggies were not visible to store patrons, as they were kept in concealed areas of the shop.

---

1. Although the Commonwealth has filed a cross-appeal in this case, we will refer to Margaret Dellisanti as Appellant throughout this opinion.

2. The Commonwealth's expert witness testified that inositol and mannitol are dietary supplements that are sold in white powder form; that cocaine dealers commonly mix inositol or mannitol with cocaine to increase the amount of cocaine product for sale; and that drug dealers refer to inositol or mannitol as "cut."

3. The full name of the store manager was later determined to be Anthony Vallone.

4. The Commonwealth introduced expert opinion testimony to establish that different sizes of plastic baggies are used to package and repackage the adulterated cocaine, that the bag size correlates with the quantity and price of the product, and that drug dealers commonly use the same color packets to identify their product.

¶ 4 On three subsequent occasions, September 28, 1999, October 4, 1999, and October 20, 1999, Detective Echevarria made additional purchases of inositol and baggies from the store, while sometimes referring to the inositol as "cut." With the exception of the September 28, 1999, purchase, which was made directly from appellant, the sales were made to Detective Echevarria by Tony. As part of each of the four transactions, appellant or Tony gave Detective Echevarria a sales receipt on which the inositol and baggies were listed as "miscellaneous items", while the other items purchased by the detective during the visit (such as a shirt and a key chain) were specifically identified on the receipts. Based on these purchases, on October 20, 1999, NET members executed a search warrant at the store and seized boxes of inositol, mannitol,[5] and plastic baggies.

¶ 5 Appellant was charged on October 20, 1999, as a result the sales of drug paraphernalia made to Detective Echevarria, with one count of possession of drug paraphernalia with the intent to deliver, and four counts of delivery of drug paraphernalia, in violation of 35 P.S. § 780–113(a)(32) and (33), and of criminal conspiracy, in violation of 18 Pa.C.S. § 903. Although appellant initially agreed to work with investigators, as a result of a breakdown in the cooperation agreement, a second criminal complaint was filed against appellant charging her with two counts of corrupt organizations, 18 Pa.C.S. § 911, graded as felonies, and criminal conspiracy, 18 Pa.C.S. § 903. All charges were subsequently consolidated for trial and on October 12, 2000, appellant entered a plea of *nolo contendre* to four counts of delivery of drug paraphernalia, as ungraded misdemeanors, and one count of disorderly

conduct.[6] At the commencement of the sentencing hearing on March 15, 2001, appellant made an oral motion to withdraw her guilty plea which was granted by the trial court.

¶ 6 Trial commenced on April 19, 2001, and the jury found appellant guilty of two counts of corrupt organizations, four counts of delivery of drug paraphernalia, one count of possession with intent to deliver drug paraphernalia, and five counts of criminal conspiracy. Appellant was subsequently sentenced to four years of probation on the first corrupt organizations conviction and to a consecutive sentence of one year probation on the remaining corrupt organizations conviction, as well as to terms of one year probation on each of the drug paraphernalia offenses, all of which were to be served concurrently with each other and with the two sentences for corrupt organizations.

¶ 7 Appellant filed the instant appeal on July 5, 2001, and the Commonwealth filed a cross-appeal on July 19, 2001, pursuant to Pa.R.A.P. 903(b). In compliance with the trial court's directive, on July 20, 2001, appellant filed a concise statement of matters complained of pursuant to Pa.R.A.P. 1925(b), thereby preserving the following questions for consideration:

I. Did not the court err by denying motion for arrest of judgment for Corrupt Organizations where [appellant] was a sole owner of a retail store and there was no proof that funds supported the business nor were there any other ties to organized crime?

II. Did not the lower court err by denying arrest of judgment for Paraphernalia where there was no proof of

(a) specific intent that items be used with controlled substances or

---

5. Mannitol is specifically listed in 35 P.S. § 780–102(b) as drug paraphernalia.

6. The Commonwealth had amended the Corrupt Organizations Bill of Information to charge appellant with the summary offense of disorderly conduct.

(b) shared criminal intent with another who had such specific intent and only proof was [the] sale of legitimate items where statute requires specific intent that items be used with drugs?

III. Did not the Court err by not instructing the jury in language of 18 Pa. C.S. § 302 regarding culpability that "mere knowledge" of what uses could be made of bags and inositol is not sufficient to convict where statute requires specific intent?

Brief for appellant, at 2.

■■■ ¶ 8 The Commonwealth, in its cross appeal, requests that we determine "whether *Commonwealth v. Lacey*, 344 Pa.Super. 576, 496 A.2d 1256 (1985), misconstrues 35 P.S. § 780–113(a)(32) and (33) (relating to drug paraphernalia) by imposing a specific intent element, disregarding the plain language of the statute which defines the requisite *mens rea* as 'knowing, or under circumstances where one reasonably should know' that an item is to be used with a controlled substance?" Brief of Commonwealth at page 4.[7] We granted *en banc* review in this matter in order to resolve any confusion that may have been created by the panel opinions of this Court in *Commonwealth v. Lacey*, *supra*, and *Commonwealth v. Potter*, 350 Pa.Super. 61, 504 A.2d 243 (1986) regarding the

---

7. We are constrained to quash the Commonwealth's appeal as there appears to be no basis upon which the Commonwealth may cross-appeal from the judgment of sentence. The Commonwealth is not an aggrieved party as it prevailed in the proceedings below. Appellant was convicted as the Commonwealth charged, and the Commonwealth took no issue with the legality or the discretionary aspects of the sentence imposed. Our research has revealed no cases in which the Commonwealth was permitted to cross-appeal from a judgment of sentence under the same or similar circumstances. It is axiomatic that a party who is aggrieved by an appealable order can appeal from that order if the issues have been properly preserved below. *See* Pa. R.A.P. 501. The requirement that a prospective appellant be aggrieved by the order which he is attempting to appeal is not one which can be waived by the action or inaction of his opponents. *Donegal Mutual Insurance Co. v. Eyler*, 360 Pa.Super. 89, 519 A.2d 1005, 1006 n. 1 (1987). An aggrieved party is one who has been adversely affected by the decision from which the appeal is taken. *Ratti v. Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 700 (Pa.Super.2000), *appeal denied*, 567 Pa. 715, 785 A.2d 90 (Pa.2001). One is not an aggrieved party when one prevails and wins the case-in-chief even if one issue in the case was decided against that party. *Eck v. Powermatic Houdaille, Div. of Houdaille Industries, Inc.*, 364 Pa.Super. 178, 527 A.2d 1012, 1017 (1987). Moreover, a prevailing party's disagreement with the legal reasoning or basis for a decision does not amount to such a cognizable aggrievement as is necessary to establish standing. *ACS Enterprises, Inc. v. Norristown Borough Zoning Hearing Bd.*, 659 A.2d 651, 654 (Pa.Cmwlth.1995), *appeal denied*, 542 Pa. 674, 668 A.2d 1136 (1995). In light of the above, in the case at bar, the Commonwealth cannot be deemed an aggrieved party entitled to file a cross-appeal.

Furthermore, in the instant case, even though the Commonwealth now argues that the trial court instructed the jury on the wrong mental element—specific intent, pursuant to *Commonwealth v. Lacey*, 344 Pa.Super. 576, 496 A.2d 1256 (1985)—the Commonwealth did not object to that instruction at the trial court level. Therefore, the Commonwealth cannot make any assignments of error with respect to that instruction. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."); Pa.R.Crim.P. 647 ("No portions of the charge nor omissions therefrom may be assigned as error unless specific objections are made thereto before the jury retires to deliberate."); *Commonwealth v. Edmondson*, 553 Pa. 160, 163, 718 A.2d 751, 752 (Pa.1998) (due to appellee's failure to object to an instruction when the court issued it, the issue was not properly preserved for appeal). Finally, the Commonwealth was not prejudiced by the erroneous instruction since the jury convicted Appellant anyway. Accordingly, we must quash the Commonwealth's cross-appeal.

*mens rea* required for conviction under 35 P.S. § 780–113(a)(33).

## I. Mens rea *Requirement of 35 P.S. § 780–113(a)(33)*

¶ 9 Appellant argues that the trial court erred when it denied her post-verdict motion for a new trial or for judgment of acquittal as to her conviction for violation of 35 P.S. § 780–113(a)(33) since the Commonwealth failed to produce any evidence of her specific intent that the items sold by her were to be used with controlled substances, or any evidence to establish that she had a shared criminal intent with another person who had the specific intent to use the items illegally. Appellant contends that in *Commonwealth v. Lacey, supra,* this Court held that the Commonwealth is required to establish beyond a reasonable doubt that the defendant had the specific intent that the items at issue be used with controlled substances.

¶ 10 Appellant further argues that because an individual cannot lawfully be convicted of a crime based on the conduct of another without proof of a shared criminal intent, she cannot lawfully be convicted of the drug offenses based on the undisclosed criminal intent of the individuals who purchased the inositol. As part of this argument, appellant claims that she cannot be convicted of violating the statute even if she thought the items might be used with controlled substances because mere thought is insufficient to establish the specific intent required by *Commonwealth v. Lacey, supra.*

¶ 11 The eminent President Judge S. Gerald Corso rejected appellant's reading of *Lacey,* noting that this Court held in *Commonwealth v. Potter, supra,* that the statute required only that the Commonwealth offer proof that the defendant had "knowledge of the likelihood that the items sold would be used in conjunction with

controlled substances." *Id.* at 245. The trial court then concluded that the Commonwealth had introduced ample circumstantial evidence to permit the jury to find appellant had knowledge of the nature and intended use of the items and knowledge of the likelihood that the items she sold would be used with controlled substances.

■ ¶ 12 While the language of *Commonwealth v. Lacey, supra,* could be read to suggest that the Commonwealth must establish specific intent on the part of the defendant in order obtain a conviction under 35 P.S. § 780–113(a)(33), the trial court correctly ruled that *Commonwealth v. Potter, supra,* held that the mens rea requirement of the offense can be satisfied by circumstantial evidence of the defendant's knowledge of the likelihood that the items sold would be used in conjunction with controlled substances. Review of the express language of the statute reveals that specific intent is not an essential element of the offense. Rather, the Controlled Substance, Drug, Device and Cosmetic Act prohibits

> [t]he delivery of, possession with intent to deliver, or manufacture with intent to deliver, drug paraphernalia, **knowing, or under circumstances where one reasonably should know,** that it would be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled substance in violation of this act.

35 P.S. § 780–113(a)(33)(emphasis supplied).

¶ 13 The scienter element of 35 P.S. § 780–113(a)(33) is unambiguous: the statute criminalizes the delivery of, possession with intent to deliver, and the manufacture

with intent to deliver drug paraphernalia, **"knowing, or under circumstances where one reasonably should know"** that the items would be used with controlled substances.

¶ 14 When an individual is charged or convicted under 35 P.S. § 780–113(a)(33), two distinct levels of analysis are required. First, there must be a determination whether the items in question constitute drug paraphernalia. This determination necessarily requires application of the definition provided in 35 P.S. § 780–102(b) for "drug paraphernalia" since only where an item is determined to be "paraphernalia" will the inquiry proceed to the second level of analysis. If the item does not fall under the definition of drug paraphernalia, then the inquiry must cease and the defendant cannot be convicted under 35 P.S. § 780–113(a)(33). In the second level of analysis, the inquiry is whether the drug paraphernalia was delivered, possessed with intent to deliver, or manufactured with intent to deliver by the defendant, **knowing, or under circumstances where the defendant reasonably should have known** that it would be used in a certain fashion.

¶ 15 A correct reading of the Section 780–113(a)(33) indicates that the Commonwealth need only establish that the defendant engaged in the prohibited conduct (delivery, possession with intent to deliver, manufacturing with intent to deliver drug paraphernalia) **knowing, or under circumstances where he reasonably should know** that the drug paraphernalia "would be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled substance in violation of this act." 35 P.S. § 780–113(a)(33).

¶ 16 As our Supreme Court recently noted:

... we must accept that when the General Assembly selects words to use in a statute, it has chosen them purposefully. 1 Pa.C.S. § 1921(b). We cannot change those words to reflect our own public policy concerns, nor can we edit them based on the supposition that we know what the General Assembly meant to say when it said something different. Where, as here, we do not believe that application of the words of the General Assembly would yield an absurd or unconstitutional result, we accord them their plain meaning, even if we may have drafted the statute differently. 1 Pa.C.S. §§ 1903, 1922.

*Commonwealth v. Scolieri*, 571 Pa. 658, 813 A.2d 672, 673–674 (2002).

¶ 17 Thus, we conclude that in order to establish the prerequisite intent to support a conviction under 35 P.S. § 780–113(a)(33), the Commonwealth need only show that the materials were manufactured or sold with knowledge of their intended illegal use or under circumstances where one reasonably should know of such intended illegal use.

## II. Sufficiency of the Evidence; Jury Instructions

■ ¶ 18 Appellant also argues that the evidence was insufficient to establish the elements of the drug paraphernalia offenses. We disagree, since the requisite intent was firmly established by the circumstantial evidence offered by the Commonwealth and accepted by the jury which included, *inter alia*, the failure to identify the items on sales receipts, the storage of the materials out of public view, and the presence in the stock room of other items related to drug use such as small screens and substances ingested for the purpose of removing drug traces from urine speci-

mens. The store of appellant is to every appearance a clothing store and not one specializing in nutritional supplements. Appellant sold the nutritional supplement as "cut," and sold the "cut" to the undercover officer in conjunction with the sale of small baggies. Moreover, during the purchase, the undercover officer told appellant that he was buying a small amount of "cut" and baggies because "business" was not good at that time. This evidence amply demonstrates that appellant was not selling the inositol as a nutritional supplement to be used by bodybuilders as she claimed, especially since bodybuilders do not refer to inositol as "cut", bodybuilders have no need for baggies in order to use inositol, and bodybuilders do not vary the quantity of inositol they use based on whether "business" is good or bad. On the other hand, cocaine dealers do refer to inositol as "cut," do use small baggies for packaging their drugs, and do vary the amount of inositol they purchase based on the pace and volume of their illicit business. Further compelling evidence of appellant's intent is provided by the presence of mannitol in appellant's store inventory, an item specifically identified by statute as drug paraphernalia, and the testimony of Detective Echevarria that there were no signs in the store indicating that these items were available for sale, and that these items were only produced and sold upon specific request by a customer.

¶ 19 Nor can there by any question that the trial evidence adduced by the Commonwealth established that inositol, the "cut" sold by appellant, meets the definition of a drug paraphernalia. " 'Drug paraphernalia' means all equipment, products and materials of any kind which are used, intended for use or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling or otherwise introducing into the human body a controlled substance in violation of this act." 35 P.S. § 780–102. When sold as "cut," inositol qualifies as a product which is used, or intended for use in the compounding, processing, packaging, repackaging, or conversion of a controlled substance (cocaine). *See, e.g., Commonwealth v. Potter, supra,* 504 A.2d at 245. Thus, the trial court properly rejected the challenge to the sufficiency of the evidence.

■ ¶ 20 Nor was appellant prejudiced by the jury charge which instructed the jury to apply a more stringent mental element—specific intent—than that actually required by the statute. The trial court's expansive instruction was not only harmless error but in fact benefited appellant by requiring the Commonwealth to establish a higher mental state on her part than that which is required under the statute for a conviction.

■ ¶ 21 Appellant also takes issue with the trial court's refusal to instruct the jury that "mere knowledge" is an insufficient basis upon which to convict a defendant of possession and possession with intent to deliver drug paraphernalia, as she contends that one must "specifically intend" that the items sold be used with controlled substances. This argument is meritless, since we have concluded that 35 P.S. § 780–113(a)(33) does not contain a specific intent requirement. The statute only requires the Commonwealth to prove that the defendant delivered, possessed with intent to deliver, or manufactured with intent to deliver drug paraphernalia, **knowing or under circumstances where the defendant reasonably should know** that the paraphernalia would be used, among other things, to plant, propagate, process, or package controlled substances.

Given the mental element required by the statute, it would be error to instruct the jury that mere knowledge is insufficient and must be complemented by specific intent. Thus, the trial court properly refused the proffered instructions.

### III.  Corrupt Organizations

¶ 22 Appellant also challenges her convictions for violation of the Pennsylvania Corrupt Organizations Act. Appellant, relying on the findings of fact made by the General Assembly in 18 Pa.C.S. § 911(a),[8] and on our Supreme Court's decision in *Commonwealth v. Bobitski*, 534 Pa. 310, 632 A.2d 1294 (1993), maintains that the Act was not intended to be used in the prosecution of an individual such as appellant, who is a retail store owner, with one part-time employee, who has no association with corrupt organizations or organized crime, or any large scale criminal enterprise.  Appellant contends that the purpose of the Act is to "ferret out organized crime 'as it is commonly understood' and to severely punish those persons who engage in organized crime through a 'pattern of racketeering activity.'" *Bobitski, id.*, at 314, 632 A.2d at 1296.  Appellant contends that since no evidence was presented to show that she was involved or associated with organized crime, or that her business received money from, or sent money to a corrupt organization, she was improperly convicted of violating the Corrupt Organizations statute.

¶ 23 The evidence presented by the Commonwealth at the trial in *Bobitski* established that the defendant, Bobitski, an employee of Thrift Drug, who was responsible for soliciting bids and awarding construction contracts, used his position to solicit bribes from various contractors over a period of approximately six years.  The Commonwealth established that the defendant either solicited direct cash payments from contractors in exchange for awarding them contracts, or utilized various contractors to improve his home at their own expense in exchange for awarding them contracts.  Thrift Drug was not aware of or involved in the defendant's scheme, and all proceeds from the illegal activities directly benefited the defendant alone.  The

---

8.  The full text of these factual findings is as follows:

(a) **Findings of fact.**—The General Assembly finds that:

(1) organized crime is a highly sophisticated, diversified, and widespread phenomenon which annually drains billions of dollars from the national economy by various patterns of unlawful conduct including the illegal use of force, fraud, and corruption;

(2) organized crime exists on a large scale within the Commonwealth of Pennsylvania, engaging in the same patterns of unlawful conduct which characterize its activities nationally;

(3) the vast amounts of money and power accumulated by organized crime are increasingly used to infiltrate and corrupt legitimate businesses operating within the Commonwealth, together with all of the techniques of violence, intimidation, and other forms of unlawful conduct through which such money and power are derived;

(4) in furtherance of such infiltration and corruption, organized crime utilizes and applies to its unlawful purposes laws of the Commonwealth of Pennsylvania conferring and relating to the privilege of engaging in various types of business and designed to insure that such businesses are conducted in furtherance of the public interest and the general economic welfare of the Commonwealth;

(5) such infiltration and corruption provide an outlet for illegally obtained capital, harm innocent investors, entrepreneurs, merchants and consumers, interfere with free competition, and thereby constitute a substantial danger to the economic and general welfare of the Commonwealth of Pennsylvania; and

(6) in order to successfully resist and eliminate this situation, it is necessary to provide new remedies and procedures.

18 Pa.C.S. § 911(a)

defendant was subsequently charged with and convicted of various crimes including two counts of violation of the corrupt organizations statute, 18 Pa.C.S. § 911(b), as a result of his conduct. The Supreme Court granted allowance of appeal to determine "whether the Pennsylvania corrupt organizations statute (18 Pa.C.S. §§ 911 *et seq.*) can be applied to an individual who committed a series of criminal acts for his own benefit while employed by a legitimate enterprise, where the Commonwealth concedes that there are no identifiable ties between the individual, the enterprise and 'organized crime.'" *Bobitski, supra,* at 312, 632 A.2d at 1295. Relying on the findings of fact contained in 18 Pa.C.S. § 911(a), the Supreme Court observed that "the express intent [of the corrupt organizations statute] was to prevent infiltration of legitimate businesses by organized crime," and to "ferret out organized crime 'as it is commonly understood' and to severely punish those persons who engage in organized crime through a 'pattern of racketeering activity.'" *Bobitski, supra* at 314, 632 A.2d at 1296. The Court then concluded that the facts alleged did not lift Bobitski's white collar crime out of the ordinary class of white collar criminals and did not make him a "part of the 'sophisticated, diversified, and widespread phenomenon' defined in the statute as organized crime." *Id.* at 315, 632 A.2d at 1297.

¶ 24 The Supreme Court again studied the Corrupt Organizations statute in *Commonwealth v. Besch,* 544 Pa. 1, 674 A.2d 655 (1996), and held that in order to come within the purview of the Corrupt Organizations Act, an illegitimate criminal enterprise had to be associated in some way with a legitimate business enterprise. Thus, if the enterprise was wholly illegitimate, such as a drug cartel, *Besch* held that the Corrupt Organization Statute was inapplicable.

¶ 25 As a result of the decision in *Besch,* the legislature, just two months later, amended the Corrupt Organizations Act so as to include wholly illegitimate enterprises within the ambit of the Corrupt Organizations Statute. The General Assembly did so on June 19, 1996,[9] by amending the definition in the Corrupt Organizations Act of the term "enterprise" to include both legitimate and illegitimate entities and governmental entities.[10]

¶ 26 The following comments, indicative of that purpose, were made on the floor of the House on April 30, 1996, as the House considered the 1996 amendments:

> MR. MASLAND: In an April 17 decision, our Supreme Court, by a 4-to-3 vote, decided that the Pennsylvania Corrupt Organizations Act did not apply to those corrupt organizations [that] wholly engaged in illegal activities. In other words they said, a corrupt organization had to also be involved in legitimate business enterprises for that to come under the purview of the Corrupt Organizations Act. That is contrary to every other State that has interpreted a similar statute. That is contrary to the United States Supreme Court interpret-

---

9. P.L. 342, No. 55, § 1 (June 19, 1996) (effective immediately).

10. " 'Organized crime' means any person or combination of persons engaging in or having the purpose of engaging in conduct which violates any provision of subsection (b) and also includes 'organized crime' as defined in section 5702 (relating to definitions)." 18 Pa.C.S. § 911(h)(8). " 'Enterprise' means any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities." 18 Pa.C.S. § 911(h)(3).

ing the RICO (Racketeer Influenced and Corrupt Organizations) Statute, and I think it sets up the anomalous situation where you could have a business engaged—a business, I say—in loan-sharking, prostitution, theft, you name it, and they would be immune from prosecution. That was not the intent, I do not believe, of this legislature back in 1970 when the act was passed. I do not think it is our intent today, and I think we ought to join with Chief Justice Nix in his dissenting opinion, along with Justices Castille and Sandra Schultz Newman, and change our act so that the rest of the Supreme Court understands what we intended. Thank you.

¶ 27 The remarks made by Senator Fisher, on the floor of the Senate, as the Senate considered the same proposed Amendments to the Act which had been passed by the House, indicate a similar purpose to reach sophisticated criminal enterprises:

Senator FISHER. Mr. President, Senate Bill No. 1172, of which I was the prime sponsor when it was originally introduced in the Senate, proposed a simple change to our RICO statute that has been on the books since 1970 that added money laundering to our definition of racketeering. The issue before the Senate here today is the amendments which have been made by the House to that bill while it was in the House of Representatives. What is it exactly that the House did to Senate Bill No. 1172? They made some other changes to the sections on broadening racketeering activities contained within the definition, **but most importantly, Mr. President, the House of Representatives, in the action which they took on April 30, added amendments to that bill in an attempt to overrule the decision of the majority, the four-per-**son majority of the Pennsylvania Supreme Court on April 17. Mr. President, in explaining what the House did in adding that amendment, it is necessary for me, just for a moment, to explain what that case was all about. That case in *Commonwealth v. Besch* is a classic case where the evidence showed a broad drug conspiracy or enterprise for which the defendant, Mr. Besch in that case, was convicted by a jury in Mifflin County of various violations of the Drug, Device, and Cosmetic Act and various violations of the Pennsylvania Corrupt Organizations Act. The four-member majority of the Supreme Court handed down a decision which was not only surprising to me but it was a strange decision based on the facts of that case, and it was a very narrow decision, and it clearly was a decision which was a deviation from a long line of cases interpreting Pennsylvania's RICO statute, not just in Pennsylvania but by the Federal courts.

The Pennsylvania Supreme Court's majority said that RICO did not apply in the *Besch* case because the enterprise involved—**and as I mentioned earlier, it was an extensive drug enterprise, and there was extensive evidence and testimony on the record of the breadth of that enterprise—the court ruled that the statute did not apply because the enterprise involved was an illegitimate enterprise, not a legitimate one.** The court used as a basis for their reasoning one section in the preamble to Pennsylvania's Corrupt Organizations Act in which they hung their hat almost exclusively on the fact that one of those sections of the preamble from which they interpreted our legislative intent when that statute was passed in 1970, **they said that section of the preamble meant that this statute only applied to legitimate enterprises.**

Mr. President, as I indicated before, the court's decision in *Besch* was a significant deviation, not just from Pennsylvania law but from law that was enunciated by courts in other States which have interpreted similar statutes, the Federal courts in a decision of the United States Supreme Court. In fact, Mr. President, in 1985 the Pennsylvania Superior Court, in a case similar to the *Besch* case, interpreted that, in fact, our RICO statute applied to legitimate and illegitimate enterprises. Since 1985, this General Assembly obviously took no action to correct the decision of the Pennsylvania Superior Court, and by our inaction and, in fact, by our subsequent amendments to the RICO statute, at least in 1990, we implied that we agreed with the Superior Court's intention of what our intent was. In addition, Mr. President, the United States Supreme Court, in the case *United States v. Turkett* in 1981, in interpreting the Federal statute after which our statute was patterned, interpreted that, in fact, the Federal statute applied not only to legitimate but also to illegitimate enterprises. In addition, in 1994, the very court that acted in the *Besch* case decided in the case of *Commonwealth v. Wetton* in 1994, by a plurality opinion, that, in fact, it upheld a case very similar to *Besch*.

Mr. President, in addition to that, the long line of cases in other jurisdictions tells me and tells many others, including Pennsylvania's Attorney General, Tom Corbett, including the members of the District Attorneys Association of Pennsylvania, including Philadelphia District Attorney Lynne Abraham, that that court decision wrongly interpreted what our legislative intent was. What we are doing here today, Mr. President, **is we are not expanding the scope of Pennsylvania's Corrupt Organizations Act, but very clearly what we are doing by concurring with the amendments added by the House of Representatives is we are clarifying that statute to say that, in fact, it is our intent that drug organizations and drug enterprises across Pennsylvania and other illegitimate enterprises across Pennsylvania were intended to be covered by this statute.** Mr. President, it is very important, in my opinion, that prosecutors across Pennsylvania have the ability in certain cases to go after an entire enterprise and try to bring the weight of Pennsylvania's Corrupt Organizations Act after those enterprises to make sure that our laws are as stiff in Pennsylvania as they are in other States.

Mr. President, to not act at this time and to allow the Supreme Court's decision in the case of *Commonwealth v. Besch* to stand would mean that we would be in the distinct minority of States across this country and would have one of the narrowest interpretations of what the Corrupt Organizations Act means in the Commonwealth of Pennsylvania.

Mr. President, I believe that not only are the amendments added by the House the right amendments, they are the appropriate amendments and they are the needed amendments that we need to make sure that Pennsylvania can continue to go after not just legitimate enterprises to try to infiltrate those enterprises with profits of illegal crime, **but also to go after illegitimate enterprises and to make sure that police and district attorneys and the Attorney General have the tools to try to stamp out organized crime activities across this great Commonwealth.**

Mr. President, I ask that the Senate concur in the amendments made by the House to this very important piece of legislation.

Thank you, Mr. President.

S.B. 1172, 180th Legis.; Pa. Legis. Journal No. 36, at pp. 2028–2029 (June 5, 1996) (emphasis supplied throughout).[11]

¶ 28 Thus, the purpose the 1996 amendment to the Corrupt Organizations statute was not to make the statute applicable to all ordinary criminals, but rather to include within its scope those criminal enterprises that had no legitimate component, such as drug distribution rings.

■ ¶ 29 A review of the evidence produced by the Commonwealth at trial reveals that, while appellant was knowingly engaged in criminal behavior and was properly convicted of the offenses of criminal conspiracy and possession with intent to deliver and delivery of drug paraphernalia, appellant was not involved in "organized crime," did not undertake "the illegal use of force, fraud, and corruption", and did not engage or conspire with others engaged in "techniques of violence [and] intimidation." Rather, appellant was a small seller of drug paraphernalia, with only one part-time employee, her co-conspirator, whose four sales of paraphernalia to undercover officers totaled less than $100 in the aggregate. Appellant is, therefore, not the type of criminal, and did not engage in the type of criminal conduct, which is the focus and purpose of the corrupt organizations statute.

¶ 30 Nor does it escape our notice that appellant and her co-defendant were charged, at the time of their arrest, with violation of the controlled substance act and conspiracy, and that the prosecution only proceeded to charge appellant with violation of the corrupt organization statute when, some six months after the initial charges were filed, appellant withdrew her guilty plea. Similarly, the judgment of

sentence imposed by the learned trial court did not call for any imprisonment, but directed appellant to serve a term of probation of five years. The factors of the two-step procedure in which the district attorney undertook to file the charges, and of the sentence of probation surely permit an impression, even perhaps an inference, that our partners in the criminal justice system do not actually view appellant as a corrupt organization racketeer.

¶ 31 As we are confident that the 1996 amendments to the Corrupt Organizations statute were not meant to, and did not, alter the requirement of a substantial criminal enterprise, whether wholly, or only partially, illegitimate, we vacate the convictions for Corrupt Organizations, affirm all remaining convictions, and remand for resentencing.

¶ 32 Judgments of sentence vacated. Case remanded for resentencing. Appeal at No. 2436 EDA 2001 quashed.

¶ 33 JOYCE, J., files a Concurring and Dissenting Opinion in which HUDOCK, STEVENS and GRACI, JJ. join.

JOYCE, J., Concurring and Dissenting:

¶ 1 While I agree with the esteemed Majority's decision to uphold Appellant's drug convictions under 35 P.S. § 780–113(a)(32) and (33) (Possession, and Possession With Intent to Deliver Drug Paraphernalia), I disagree with Majority's analysis and conclusion with respect to Appellant's conviction of violation of the Pennsylvania Corrupt Organizations Act (Pa.C.O.A.), 18 Pa.C.S.A. § 911.

¶ 2 Appellant argued that the trial court erred in denying her motion for arrest of judgment with respect to the corrupt organizations charge because the evidence

11. A unanimous Senate enacted the amendment to the Corrupt Organization Act, and

Governor Ridge signed the Bill in law on June 19, 1996.

showed that Appellant was the sole owner of a retail store and there was no proof that funds from organized crime supported the business nor were there any other ties to organized crime.

> [F]or a trial court to properly grant a criminal defendant's motion in arrest of judgment on the ground of insufficient evidence, it must be determined that accepting all of the evidence and all reasonable inferences therefrom, upon which, if believed [the verdict could properly have been based], it would be nonetheless insufficient in law to find beyond a reasonable doubt that the [defendant] is guilty of the crime charged.

*Commonwealth v. Melechio,* 442 Pa.Super. 231, 658 A.2d 1385, 1387 (1995) (internal citations and quotation marks omitted).

¶ 3 The Majority goes to great lengths to explain the purpose and the reasons for the enactment of the Corrupt Organizations Act as well as the 1996 amendment to the Act in the aftermath of the Supreme Court's decision in *Commonwealth v. Besch,* 544 Pa. 1, 674 A.2d 655 (1996). Yet, conspicuously absent from the Majority's discussion is any reference to the language of the statutory section under which Appellant was convicted. There was no analysis or application of the language of the statutory section to the evidence adduced at trial. I believe this to be an incorrect approach and a flaw in the Majority's analysis. Under 1 Pa.C.S.A. § 1921:

> (b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

> (c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:

> (1) The occasion and necessity for the statute.

> (2) The circumstances under which it was enacted.

> (3) The mischief to be remedied.

> (4) The object to be attained.

> (5) The former law, if any, including other statutes upon the same or similar subjects.

> (6) The consequences of a particular interpretation.

> (7) The contemporaneous legislative history.

> (8) Legislative and administrative interpretations of such statute.

*Id.* Based on the above statute, where the intent of the legislature is clear from the plain meaning of the statute, we need not pursue statutory interpretation. *Commonwealth v. Packer,* 568 Pa. 481, 488, 798 A.2d 192, 196 (2002). It is only when the language of the statute is ambiguous that we must resort to statutory construction. *Id.* Along the same lines, our Court opined that "[i]n construing a statute to determine its meaning, courts must first determine whether the issue may be resolved by reference to the express language of the statute, which is to be read according to the plain meaning of the words." *Commonwealth v. Lopez,* 444 Pa.Super. 206, 663 A.2d 746, 748 (1995) (citations omitted). In another case, our Court explained that:

> When the words of a statute are clear and unambiguous, a court cannot disregard them under the pretext of pursuing the spirit of the statute. Only if a statute is unclear may a court embark upon the task of ascertaining the intent of the legislature by reviewing the necessity of the act, the object to be attained, the circumstances under which it was enacted and the mischief to be remedied.

*Grom v. Burgoon,* 448 Pa.Super. 616, 672 A.2d 823, 825 (1996) (citations omitted).

¶ 4 In the case at the bar, the first consideration should be the express lan-

guage of the statutory section under which Appellant was convicted. It is significant to note that Appellant does not argue that the statutory section is unclear or ambiguous. Further, the Majority does not allege or contend that the section is unclear or ambiguous. Accordingly we must focus on the express language of the statutory section. Only when the meaning of the statute is unclear or ambiguous is it necessary to consider other extraneous things such as the findings of fact, the legislative history, the statements of legislators and so forth. In the instant case, Appellant was convicted of violating 18 Pa.C.S.A. § 911(b)(3) which provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Id.*

¶ 5 The Corrupt Organizations Act contains a definitions section which, among other things, defines the critical terms in the above statutory section, namely, "person," "enterprise," "Racketeering activity," and "Pattern of racketeering activity" as follows: [12]

(h) **Definitions.**—As used in this section:

(1) "Racketeering activity" means:

(i) any act which is indictable under any of the following provisions of this title:

Chapter 25 (relating to criminal homicide)

Section 2706 (relating to terroristic threats)

Chapter 29 (relating to kidnapping)

Chapter 33 (relating to arson, etc.)

Chapter 37 (relating to robbery)

Chapter 39 (relating to theft and related offenses)

Section 4108 (relating to commercial bribery and breach of duty to act disinterestedly)

Section 4109 (relating to rigging publicly exhibited contest)

Section 4117 (relating to insurance fraud)

Chapter 47 (relating to bribery and corrupt influence)

Chapter 49 (relating to falsification and intimidation)

Section 5111 (relating to dealing in proceeds of unlawful activities)

Section 5512 through 5514 (relating to gambling)

Chapter 59 (relating to public indecency)

(ii) any offense indictable under section 13 of the act of April 14, 1972 (P.L. 233, No. 64), [FN1] known as The Controlled Substance, Drug, Device and Cosmetic Act (relating to the sale and dispensing of narcotic drugs);

(iii) any conspiracy to commit any of the offenses set forth in subparagraphs (i) and (ii) of this paragraph; or

(iv) the collection of any money or other property in full or partial satisfaction of a debt which arose as the result of the lending of money or other property at a rate of interest exceeding 25% per annum or the equivalent rate for a longer or shorter period, where not otherwise authorized by law.

Any act which otherwise would be considered racketeering activity by reason of the application of this paragraph, shall not be excluded from its application solely because the operative acts took

---

12. If a statute contains its own definitions, the meaning of a term as defined at common law, or as construed under prior statutes is not controlling. *See Commonwealth v. Sitkin's Junk Co.,* 412 Pa. 132, 194 A.2d 199, 202 (1963).

place outside the jurisdiction of this Commonwealth, if such acts would have been in violation of the law of the jurisdiction in which they occurred.

(2) "Person" means any individual or entity capable of holding a legal or beneficial interest in property.

(3) "Enterprise" means any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities.

(4) "Pattern of racketeering activity" refers to a course of conduct requiring two or more acts of racketeering activity one of which occurred after the effective date of this section.

(5) "Racketeering investigator" means an attorney, investigator or investigative body so designated in writing by the Attorney General and charged with the duty of enforcing or carrying into effect the provisions of this section.

(6) "Racketeering investigation" means any inquiry conducted by any racketeering investigator for the purpose of ascertaining whether any person has been involved in any violation of this section or of any order, judgment, or decree of any court duly entered in any case or proceeding arising under this section.

(7) "Documentary material" means any book, paper, record, recording, tape, report, memorandum, written communication, or other document relating to the business affairs of any person or enterprise.

(8) "Organized crime" means any person or combination of persons engaging in or having the purpose of engaging in conduct which violates any provision of subsection (b) and also includes "orga-

nized crime" as defined in section 5702 (relating to definitions).

18 Pa.C.S.A. § 911(h). Thus, when read in conjunction with the definitions section (18 Pa.C.S.A. § 911(h)), the language of the statutory section under which Appellant was convicted (18 Pa.C.S.A. § 911(b)(3)) is clear and unambiguous.

¶ 6 Accepting the premise that the statutory section is clear and unambiguous, there no need to resort to the legislative findings of fact or the legislative history to determine the purpose of the statutory section or the reasons for the enactment of that section. Our task is to examine the plain language of the statutory section and to determine whether Appellant's conduct falls within the ambit of the prohibited conduct, bearing in mind that the evidence must be viewed in the light most favorable to the Commonwealth. As such, in reviewing Appellant's conviction under 18 Pa. C.S.A. § 911(b)(3), it must be determined whether Appellant's store is an enterprise, whether Appellant is a person employed by or associated with an enterprise, whether Appellant engaged in a pattern of racketeering activity, and whether Appellant conducted or participated in the conduct of an enterprise through a pattern of racketeering activity.

¶ 7 Appellant's retail store meets the definition of an enterprise. It is a legitimate business entity that is engaged in commerce. The primary purpose of the store is the sale of clothing items. Secondarily, Appellant sold at the store such items as inositol, mannitol, and plastic baggies. With respect to employment or association with an enterprise, it is undisputed that Appellant is the self-employed owner of the clothing store at issue in this case. She acquired, maintained and sold items at the store. She also employed another individual, Anthony Vallone to help in the sale of items and overall conduct of the

store's affairs. Therefore, Appellant is an individual employed by or associated with an enterprise.

¶ 8 Next, it must be determined whether Appellant engaged in a pattern of racketeering activity, and whether she conducted or participated in the conduct of the affairs of the clothing store through a pattern of racketeering activity. According to the statute, racketeering activity means any act which is indictable under certain sections of the Crimes Code, including, 35 P.S. § 780–113 (the Controlled Substance, Drug, Device and Cosmetic Act). *See* 18 Pa.C.S.A. § 911(h)(1)(ii) and (iii). A "pattern of racketeering activity" refers to a course of conduct requiring two or more acts of racketeering activity one of which occurred after the effective date of this section." 18 Pa.C.S.A. § 911(h)(4).

¶ 9 Appellant's conduct in selling inositol under the name "cut" to an undercover police officer is certainly an indictable act under, 35 P.S. § 780–113. Appellant and her co-conspirator, Anthony Vallone, sold "cut" to Detective Echevarria on more than two occasions. Therefore, the facts established at trial showed that Appellant engaged in a pattern of racketeering activity as defined by the corrupt organizations statute. For purposes of the Corrupt Organizations Act, it is unnecessary to consider whether these acts are sufficient for conviction of the predicate drug offenses. Indeed, our case law emphasizes that conviction of the predicate offenses is neither required nor necessary in the determination of a violation of the corrupt organizations statute. *See Commonwealth v. Magliocco*, 806 A.2d 1280, 1287 (Pa.Super.2002) ("Under the Corrupt Organization Act, an offense could be established by proving, *inter alia*, that a person received income 'from a pattern of racketeering activity in which he participated as a principal.' 18 Pa.C.S. § 911(b)(1). The

statute defined the element of 'racketeering' as 'any act which is indictable' under a prescribed number of Crimes Code chapters. 18 Pa.C.S. § 911(h)(1)(i). Significantly, this language does not require any criminal conviction, but merely a pattern of 'indictable' acts"). *See also Commonwealth v. Cassidy*, 423 Pa.Super. 1, 620 A.2d 9 (1993), *appeal denied*, 536 Pa. 619, 637 A.2d 279 (1993) (upholding a defendant's conviction for violation of the corrupt organizations statute even though he had been acquitted of the predicate criminal acts).

¶ 10 Our next task is to determine whether Appellant conducted or participated in the conduct of the affairs of the clothing store through a pattern of racketeering activity. The evidence presented at trial showed that Appellant repeatedly used the resources of her retail store business to acquire and maintain an inventory of mannitol, inositol, and small plastic bags for sale to cocaine dealers, to be used in the packaging and sale of cocaine. She further used the resources of the store, including the labor of the store manager, Anthony Vallone, to sell the inositol and small plastic bags. She regularly received income from such sale and the income was funneled to, and intermingled with income received from the sale of other legitimate items in the clothing store. By selling drug paraphernalia on several occasions at her clothing store, Appellant certainly engaged in a pattern of racketeering activity. Through the pattern of racketeering activity, Appellant conducted or participated in the conduct of the affairs of the clothing store.

¶ 11 Appellant's conduct in the instant case is comparable to the conduct at issue in *Commonwealth v. Rickabaugh*, 706 A.2d 826 (Pa.Super.1997). In *Rickabaugh*, we affirmed the defendant's conviction of violation of the corrupt organizations statute

where the defendant intertwined his illegal cocaine business with his otherwise legitimate bar business. He sold cocaine from the bar, used money from the cash register to purchase cocaine, and held after-hours cocaine parties in the bar. Consistent with *Rickabaugh,* I would find, based on the express language of the statute, that the evidence sufficiently established Appellant's violation of the corrupt organizations statute.

¶ 12 Even if we find it necessary to go beyond the express language of the statute to the legislative findings of fact, I must point out that the emphasis on the legislative findings of fact (by both Appellant and the Majority) erroneously assumes that the findings of fact constitute an exhaustive list of factual scenarios and circumstances under which a defendant may be convicted of violation of the Corrupt Organizations Act. The legislature did not so state.

¶ 13 Further, it is important to note that the statute under which Appellant was convicted, 18 Pa.C.S.A. § 911(b)(3), does not refer to the findings of fact contained in 18 Pa.C.S.A. § 911(a). The legislature did not state that a conviction or prosecution under 18 Pa.C.S.A. § 911(b)(3) must be guided or controlled by the findings of fact contained in 18 Pa.C.S.A. § 911(a). The legislature could have conditioned convictions under the Corrupt Organization Act upon proof that the acts fell under the activities delineated in the findings of fact. However, the legislature chose not to do so. Thus, the propriety of considering the legislative findings of fact while ignoring the plain language of the statute under which Appellant was convicted is questionable at best.

¶ 14 Another significant point worthy of mention is that the Pennsylvania Corrupt Organizations Act is patterned after the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. § 1961 *et seq.* Under the federal statute, there is no requirement for the prosecution to establish a nexus between the individual and/or the enterprise being charged and "organized crime." *See H.J. Inc., et al. v. Northwestern Bell Telephone Co., et al.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Although in 1993, our Supreme Court did not find the federal interpretation of the RICO statute instructive or binding in the interpretation of the Pennsylvania Corrupt Organizations statute (*see Commonwealth v. Bobitski,* 534 Pa. 310, 632 A.2d 1294, 1296 n. 2 (1993)), that approach was implicitly disapproved by the legislature in 1996. This is shown by the legislators' references to the federal RICO statutes in their 1996 debates in the aftermath of the *Besch* decision. For instance, the following comments were made on the floor of the House on April 30, 1996 as the House considered the 1996 amendments:

> MR. MASLAND: In April 17 decision, our Supreme Court ... decided that the Pennsylvania Corrupt Organizations Act did not apply to organizations [that] wholly engaged in illegal activities.... That is contrary to every other State that has interpreted a similar statute. That is contrary to the United States Supreme Court interpreting RICO Statute

¶ 15 On the Senate floor, Senator Fisher made the following remarks regarding the 1996 amendments:

> Senator FISHER:
>
> \*     \*     \*     \*     \*     \*
>
> Mr. President, as I indicated before, the [Supreme] court's decision in *Besch* was a significant deviation, not just from Pennsylvania law but from law that was enunciated by courts in other States which have interpreted similar statutes,

the Federal courts in a decision of the United States Supreme Court.... In addition Mr. President, the United States Supreme Court, in the case of *United States v. Turkett* in 1981, in interpreting **the federal statute after which our statute was patterned**, interpreted that, in fact, the Federal Statute, applied not only to legitimate but also illegitimate enterprises.

\* \* \* \* \* \*

S.B. 1172, 180th Legis.; Pa. Legis. Journal No. 36, at pp. 2028–2029 (June 5, 1996) (emphasis added).

¶ 16 From the remarks of the legislators, it can be seen that the Pennsylvania Corrupt Organizations statute was patterned after the federal RICO statute, that the legislature considers and expects our Courts to consider the interpretations of the federal RICO statute in our interpretation of the Pennsylvania Corrupt Organizations Act. Operating with the premise that we can legitimately consider for guidance, the federal courts' interpretation of the federal RICO statute, it is beyond debate that the scope of the federal RICO statute is not limited to persons or entities connected with organized crime. *See H.J. Inc., et al. v. Northwestern Bell Telephone Co., et al.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Sedima, S.P.R.L. v. Imrex Inc., et al.,* 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *United States v. Stokes,* 944 F.2d 211 (5th Cir.1991); *United States v. Ruiz,* 905 F.2d 499 (1st Cir.1990); *Jensen v. Snellings,* 841 F.2d 600 (5th Cir.1988); *Gilbert v. Prudential–Bache Securities,* 769 F.2d 940 (3rd Cir. 1985); *Plains Resources Inc. v. Gable,* 782 F.2d 883 (10th Cir.1986); *United States v. Campanale,* 518 F.2d 352, 363–64 (9th Cir. 1975); *United States v. Thordarson,* 646 F.2d 1323, 1328, n. 10 (9th Cir.1981).

¶ 17 It is also significant to note that the legislative findings of fact pursuant to which the Majority invalidates Appellant's conviction is almost identical to the congressional findings of fact underlying the federal RICO statute as shown below:

The Congress finds that (1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and corruption; (2) organized crime derives a major portion of its power through money obtained from such illegal endeavors as syndicated gambling, loan sharking, the theft and fencing of property, the importation and distribution of narcotics and other dangerous drugs, and other forms of social exploitation; (3) this money and power are increasingly used to infiltrate and corrupt legitimate business and labor unions and to subvert and corrupt our democratic processes; (4) organized crime activities in the United States weaken the stability of the Nation's economic system, harm innocent investors and competing organizations, interfere with free competition, seriously burden interstate and foreign commerce, threaten the domestic security, and undermine the general welfare of the Nation and its citizens; and (5) organized crime continues to grow because of defects in the evidence-gathering process of the law inhibiting the development of the legally admissible evidence necessary to bring criminal and other sanctions or remedies to bear the unlawful activities of those engaged in organized crime and because the sanctions and remedies available to the Government are unnecessarily limited in scope and impact.

It is the purpose of this Act [see Short Title note above] to seek the eradication of organized crime in the United States by strengthening the legal tools in the

evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime.

Organized Crime Control Act of 1970, Pub.L. 91–452.

¶ 18 Since federal courts interpreting the federal RICO statute have not restricted the scope of the statute to individuals or entities connected with organized crime despite the above Congressional findings of fact, I find it unwarranted to restrict the scope of the Pennsylvania Corrupt Organizations Act to individuals or entities connected with organized crime based on similar legislative findings of fact.

¶ 19 Another aspect of the Majority Opinion with which I disagree is the suggestion of improper prosecutorial conduct because Appellant was charged with the corrupt organizations counts after the plea negotiations and the promise of co-operation proved unsuccessful. *See* Majority Opinion, at 1171. I note that Appellant herself does not allege or suggest prosecutorial misconduct as the Majority does. Further, in this Commonwealth, a prosecutor may, as part of plea negotiations, decide to charge a defendant with fewer crimes or fewer counts of a crime than a defendant could be charged. The prosecutor may also decide to *nolle pros* certain charges in consideration of a defendant's promise to co-operate with the Commonwealth in another investigation. When the plea negotiations or the promise of co-operation fail, the prosecutor may legitimately charge a defendant with the full range of crimes which the defendant could have been charged with in the first place. These are legitimate prosecutorial tactics which are part and parcel of the give-and-take of plea negotiations. As such, I cannot join the Majority's innuendo and suggestion of improper prosecutorial conduct in this case.

¶ 20 In conclusion, I would find that the statutory section under which Appellant was convicted, 18 Pa.C.S.A. § 911(b)(3), is clear and unambiguous on its face and there is no need to consult the legislative history or the legislative findings of fact to interpret the statutory section; that applying the express language of the statutory section and construing the evidence in the light most favorable to the Commonwealth, Appellant was properly convicted of violating the Pennsylvania Corrupt Organizations statute; and that considering the federal interpretation of a similar statute (RICO) which has similar findings of fact, Appellant's conviction must stand.

¶ 21 Accordingly, I respectfully dissent.